UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
v.                             )      No. 3:10-CR-31
                               )      (PHILLIPS/SHIRLEY)
DEON T. PATTON,                )
                               )
              Defendant.       )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court, as may be appropriate. The Defendant is charged in an one-count Indictment [Doc. 1], which contends that the Defendant knowingly possessed a firearm, namely, a .327 caliber Taurus Model 327 revolver, despite his having been previously convicted of a felony. Now before the Court is the Defendant's Motion to Suppress and Memorandum in Support [Doc. 19] and the Government's Response in Opposition to Defendant's Motion to Suppress and Memorandum in Support [Doc. 20], along with the parties' supplemental memoranda [Docs. 30, 31].

The parties appeared before the Court for a motion hearing on November 5, 2010. Assistant United States Attorney Cynthia Davidson was present representing the Government. Attorney Gerald Gulley was present representing the Defendant, who was also present. The Court heard the evidence presented and the arguments of the parties on the motion.

# I.    POSITIONS OF THE PARTIES

The Defendant moves the Court to suppress certain evidence from being admitted at the trial of this matter.   The Defendant moves the Court to suppress "all evidence obtained by law enforcement in this case."  It appears to the Court that this general request covers two pieces of evidence: (1) a .327 caliber Taurus Model 327 revolver, found in the automobile that the Defendant was driving on the night of his arrest, and (2) his statements to officers about this firearm.

The Defendant maintains that following the decision of the Supreme Court of the United States in <u>Arizona v. Gant</u>, 556 U.S. ___, 129 S.Ct. 1710 (2009), there are only two limited circumstances under which a search incident to arrest is permissible: (1) where there is no reasonable means to limit the passenger's access to the vehicle and (2) where evidence relevant to the offense of arrest could be located in the vehicle.  The Defendant maintains that the search at issue in this case does not meet fall within either of these scenarios, and he, therefore, moves that the evidence yielded by the physical search of the automobile be suppressed. [<u>See</u> Doc. 19 at 4-5].

The Defendant also argues that he was taken into custody by officers, and he was asked questions that were the functional equivalent of interrogation, without being advised of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  On this basis, the Defendant moves that any statements he made to the officers should be suppressed. [Doc. 19 at 5-6].

The Government responds that any <u>Gant</u> arguments are misplaced, because this stop was based upon a K-9 alert and was not a search incident to arrest. [Doc. 20 at 4].  The Government argues that the Defendant was not interrogated, and his statements were voluntary. [Doc. 20 at 5]. The Government maintains that the officers asked the Defendant for his keys to gain access to the car and did not ask questions meant to provoke incriminating statements. [Doc. 20 at 5].

## II.    FACTS

The Court heard from two witnesses at the suppression hearing, Sergeant John Kelly and Officer Brian Mullane.  The witnesses testified as follows:

### A.    Sergeant John Kiely

Sergeant John Kiely testified that he is a patrol sergeant with the Knoxville Police Department ("KPD").  Sergeant Kiely confirmed that he is of a supervisory rank and has been in law enforcement thirteen years.

Sergeant Kiely, first, explained the protocol for responding to calls.  He stated that dispatch's protocol is that if a call is on an officer's beat and that officer is available, he goes.  Sergeant Kiely explained that if no officer is on that beat, the call will be referred to him, and he will decide who goes to the call.  Sergeant Kiely reiterated that most of the time the dispatcher determines who goes to a call.  Sergeant Kiely testified that the K-9 assigned to his unit stays out for service on in-progress class, unless he is directed otherwise or there is a need for back-up.

Sergeant Kiely confirmed that he responded to a call on November 28, 2009, at 4:18 a.m., at 4924 Fleetwood Drive.  Sergeant Kiely noted that he is familiar with the area because he has been assigned to the area since he began working for the KPD.  He estimated that eight percent of his time with the KPD has been spent in "the 70s district," the area that encompasses Fleetwood Drive. Sergeant Kiely agreed that the area is nice and residential.

Sergeant Kiely described the call he responded to as a breaking and entering, in progress, meaning that someone was actively breaking into an occupied dwelling. Sergeant Kiely said he determined that he needed back-up, and Officer Brian Mullane responded because he is assigned to respond to in-progress calls because a K-9 dog may need to be utilized to apprehend a suspect to

prevent an officer or suspect getting hurt.

Sergeant Kiely said that he was not far from the call when it was called in, and he arrived "pretty quick." Sergeant Kiely explained that he was especially aware of the danger of an in-progress call because a friend, Officer Rickman, had recently been shot responding to a similar call, so he parked away from the house. Sergeant Kiely said he knew Officer Mullane was coming, so he decided to listen and look to see what was going on as he approached the house.

Sergeant Kiely confirmed that he had re-listened to his radio traffic before coming to the hearing, and he identified a compact disc as containing the recording of his radio traffic. This compact disc was received into evidence as **Exhibit 1**.[1] A portion of this recording was played for the Court, and Sergeant Kiely confirmed that he knew the suspect's name, Deon Patton, and the description of his vehicle prior to approaching the home.

Sergeant Kiely explained that he parked on the side of the road and began slowly walking toward the home and listening. Dispatch said that the suspect had just left. Sergeant Kiely said he could not see the house due to a rise in the road, but he saw lights coming toward him in his lane. Sergeant Kiely shined his flashlight so he did not "get run over." Sergeant Kiely testified that a small white car pulled into the correct lane and stopped near him. Sergeant Kiely said he asked the driver his name, to which he responded "Deon Patton."

Sergeant Kiely testified that he had reviewed his in-cruiser video before coming to the hearing, and he identified a compact disc as containing the video recording from the camera in his

---

[1]Portions of Exhibit 1 were played throughout the suppression hearing. In order to keep the Court's discussion of the testimony cohesive and organized, the Court will discuss the pertinent portions of the recording in a separate discussion of the audio and video evidence presented, see infra at III.

cruiser. This compact disc was received into evidence as **Exhibit 2**.

The Government played **Exhibit 2** beginning at 4:23:53 a.m.[2] Sergeant Kiely explained that, in the portion of the video that was played, he asked the Defendant to turn off his vehicle and step out of the car, and the Defendant complied. Sergeant Kiely said that he observed that the Defendant was very tense and his eyes were wide open. Sergeant Kiely explained that, based upon his training, it appeared to him that the Defendant was intoxicated or on some type of narcotic. Sergeant Kiely said he got the Defendant out of the car and handcuffed him immediately. Sergeant Kiely described the Defendant as a bigger guy and said that he began to talk to the Defendant calmly asking, "What's going on."

Sergeant Kiely testified that, next, he patted the Defendant down. The Defendant said, "Why did you say I had a gun," or something similar. Sergeant Kiely said that he told the Defendant that he did not know what the Defendant was talking about because he did not say that the Defendant had a gun. Sergeant Kiely explained that the Defendant responded that the radio said he had a gun. Sergeant Kiely testified that this comment heightened his senses, and he patted the Defendant down again, just in case he had missed a firearm. He noted that he did not want to miss a firearm on a dark street at 4:00 in the morning. Sergeant Kiely testified that he did not accuse the Defendant of having a gun. Sergeant Kiely said he was focused upon talking to the Defendant, and he did not hear the update from the dispatcher regarding a gun that the Defendant was referring to.

---

[2]Portions of Exhibit 2 were played throughout the suppression hearing. In order to keep the Court's discussion of the testimony cohesive and organized, the Court will discuss the pertinent portions of the recording in a separate discussion of the audio and video evidence presented, see infra at III.

Sergeant Kiely confirmed that at approximately 4:28 a.m., his back-up arrived. Officer Brian Mullane was the first to arrive, followed by Officer Stryker. Sergeant Kiely explained that around this time he got the Defendant's identification. Sergeant Kiely noted that the Defendant was requesting that his handcuffs be taken off, but Sergeant Kiely said he would not do so until everything was figured out. Sergeant Kiely explained that he directed Officer Mullane to go to the house and talk to the complainant to see what was going on. Sergeant Kiely said he put the Defendant in the back of his cruiser to get his side of the story.

Sergeant Kiely explained that in the recording from approximately 4:37 a.m., he was asking the Defendant about his criminal history, as part of his investigation. Sergeant Kiely said that the Defendant started giving him a hard time. Sergeant Kiely testified that the Defendant noted that he had worked out at some of the Department of Energy plants. Sergeant Kiely asked the Defendant about his clearance for this facilities, and the Defendant said he did construction at the plants. Sergeant Kiely said he was familiar with security clearances through his work at the Air National Guard, and he was trying to determine if the Defendant had a clearance that might lend him some credibility. Sergeant Kiely confirmed that, at this point, he had not read the Defendant his rights under Miranda.

Sergeant Kiely testified that at approximately 4:38 a.m., he was telling the Defendant that he is trying to get the situation "figured out," so that if the accusations are made up, the Defendant can go home.

Sergeant Kiely stated that he exited his cruiser and talked to Officer Mullane, who had come back up from the house. Sergeant Kiely noted that he suspected the Defendant was on narcotics and that Officer Mullane's K-9 is trained to sniff narcotics. Sergeant Kiely said he asked Officer

Mullane to do a sniff of the Defendant's vehicle. He did, and Sergeant Kiely explained that on the video one can see the K-9 alert on the driver's door.

Sergeant Kiely testified that he is familiar with dog alert patterns. He explained that he has worked with different dogs, but he noted that Officer Mullane has been on his squad for sometime. Sergeant Kiely said he knows that Officer Mullane's dog alerts by sitting. Sergeant Kiely said that periodically he will train with Officer Mullane and that they perform exercises to insure that the dog is not alerting just to get a toy. Sergeant Kiely explained that when the dog alerted in the cruiser video he was giving his Kong, a plastic toy.

Sergeant Kiely testified that when Officer Mullane returned he told Sergeant Kiely that the light bulbs on the house's porch had been removed. Sergeant Kiely could not remember whether Officer Mullane said the front porch or the back porch lights had been removed, but he did remember that the light bulbs had been thrown in the yard. Sergeant Kiely recalled Officer Mullane saying that a bedroom window had been pushed up, as if someone had tried to get into the home. Sergeant Kiely also noted that he had been told that the complainant said the Defendant was known to use narcotics.

After reviewing the cruiser recording from approximately 4:46 to 4:51 a.m., Sergeant Kiely explained that after the dog alerted on the automobile, he went to get the keys from the Defendant. Sergeant Kiely said he told the Defendant that the dog had alerted on his vehicle for the odor of narcotics. Sergeant Kiely said he asked the Defendant for the keys, and the Defendant "squirmed" around in the backseat. Sergeant Kiely believed that the Defendant did not want to give him the keys. Sergeant Kiely testified that the Defendant responded that, if Sergeant Kiely fixed his handcuffs, he would give him the car keys. Sergeant Kiely said he got out of the cruiser, fixed the

Defendant's handcuffs, and got his keys. Sergeant Kiely noted that he also told the Defendant to sit sideways in the cruiser so that the handcuffs would not bother him.

Sergeant Kiely testified that when the Defendant sat back down in the cruiser he looked at him in the same way he had earlier, as if "he's about to start fighting." Sergeant Kiely recalled thinking that the Defendant might start fighting the officers. Sergeant Kiely explained that the Defendant stopped, and said, "Hey I ain't going to lie to you. I've got a gun in the car."

Sergeant Kiely asserted that he was not interrogating the Defendant at this point. Sergeant Kiely said that he asked the Defendant his name and questions, like: Is the claimant your girlfriend? Is she your wife?

Sergeant Kiely said that he stood by the driver's side door, while Officer Mullane, he thought, searched the car. Sergeant Kiely explained that on the video one can hear a conversation when Officer Mullane sees the gun. Officer Mullane started to move the gun, and Sergeant Kiely said he told him to leave it for the Crime Lab.

On cross-examination, Sergeant Kiely confirmed that the call for assistance came in at about 4:18 or 4:19 a.m. Sergeant Kiely said it did not take him long to get to the house, but he said the video recording would have the exact time because he did not recall exactly how long it took. Sergeant Kiely confirmed that Fleetwood Drive was a quiet neighborhood at that time of the morning, and he agreed that the homes were fairly well-kept. Sergeant Kiely said he had been to Fleetwood Drive in the daytime, and he agreed that it was not an excessively traveled street during the day.

Sergeant Kiely agreed that he received a breaking and entering call and that, actually, two separate calls had come from two different people in the house. After receiving the calls, Sergeant

Kiely drove to Fleetwood Drive, and he confirmed that during that time dispatch had requested that Officer Mullane join him on the call. Sergeant Kiely noted that in his squad, when an in-progress call comes out, the K-9 "better be en route." Sergeant Kiely again explained that the K-9 is used for purposes other than just searching for drugs, and he gave examples, such as, a barricaded suspect, where there is a need for show of force, and area searches.

Sergeant Kiely explained that he did not specifically ask dispatch for Officer Mullane to be sent to the scene. Nor was he sent because he was the closest officer to the scene. Sergeant Kiely explained that officers' assignment worksheets include their assignments for the day, and Officer Mullane's would direct that he be sent to in-progress calls only. Sergeant Kiely noted that Officer Mullane's identified number has a "K" in it to indicate he is a K-9 handler and that he would have been sent to the in-progress call specifically because he had the dog. Sergeant Kiely testified that an officer with a dog would be sent to an in-progress call because for officer safety, and again, noted that Officer Rickman, who was recently shot, did not have a K-9. Sergeant Kiely explained that when worksheets are e-mailed out they would say that Officer Mullane has in-progress calls only.

Sergeant Kiely confirmed that "67" was an internal code for a residential breaking and entering in progress. He stated that he could not recall whether the breaking and entering was alleged to have occurred in the front of the back of the Fleetwood Drive home. Sergeant Kiely said that "83" is code for a domestic dispute. Sergeant Kiely testified that on the way to the home he knew there was a breaking and entering possibly related to a domestic situation, and he agreed that domestic situations can be "messy" and dangerous.

Sergeant Kiely explained that on the date of the incident, his car was equipped with a recording system which was manually activated and that he activated the recording during different

portions of the stop. Sergeant Kiely said he did not prepare an incident report, but he noted that Officer Mullane did prepare a report.

Sergeant Kiely confirmed that the Defendant was not given <u>Miranda</u> warnings at any time in his presence. When asked whether Officer Mullane advised the Defendant of his rights under <u>Miranda</u> on the way to the police station, Sergeant Kiely responded that Officer Mullane did not take him back. Sergeant Kiely added that he, in general, did not know whether Officer Mullane advised the Defendant, but Sergeant Kiely noted that he did not advise the Defendant himself because he was not asking questions for a criminal case. Sergeant Kiely agreed that he asked the Defendant about his relationship with the complainant.

Sergeant Kiely was asked whether breaking and entering was a potential crime, he responded that he did not ask the Defendant about the break and entering. He said that he instead asked, "What was going on?" Sergeant Kiely noted that he never asked, for example, what door or window the Defendant tried to go into. Sergeant Kiely said that he, instead, sent Officer Mullane down to ask about those details. Sergeant Kiely explained that he has been conducting investigations for quite a while, and he must know what is going on before he interviews the suspect. Sergeant Kiely testified that if he was going to interview the Defendant, he would have read him his rights.

Sergeant Kiely stated that he did not consider the Defendant a suspect. Sergeant Kiely described the Defendant as a "person of interest," which he said meant that the Defendant was not necessarily going to jail because the officers did not have a case at that point. Sergeant Kiely testified that the Defendant was a person of interest until an officer came back and verified what had happened at the house or what they observed.

Sergeant Kiely said he did not stop the Defendant. Instead, the Defendant pulled over to the side of the road. Sergeant Kiely noted that he could see the excitement in the Defendant's face. Sergeant Kiely testified that, based upon his training and experience, when he sees that type of expression he usually gets some type of injury inflicted on him. Sergeant Kiely recalled that he asked the Defendant to turn off his vehicle and that the Defendant did not comply until the third request. Sergeant Kiely agreed that it did not take very long to get the Defendant to turn off the car.

Sergeant Kiely explained that after he asked the Defendant to turn off the car, he asked the Defendant to step out of the car. Sergeant Kiely said that when the Defendant stepped out he detained him by handcuffing him. Sergeant Kiely agreed that the handcuffing took place with a minimal amount of trouble, and he noted that the Defendant stayed handcuffed throughout his time with Sergeant Kiely. Sergeant Kiely confirmed that he walked the Defendant to his cruiser and placed him in the back so that he would be secure. Sergeant Kiely testified that he got in the cruiser with the Defendant at some point, but he did not stay in the car the whole time. Sergeant Kiely confirmed that the door was shut behind the Defendant, it could not be opened from the inside, and the Defendant was detained. Sergeant Kiely agreed that his conversations with the Defendant could be heard in the background of the cruiser recording.

Turning back to the Defendant's expression, Sergeant Kiely testified that the Defendant's eyes were "wide open," and Sergeant Kiely thought that he was excited and possibly on narcotics because of this expression. Sergeant Kiely agreed that there are other reasons why a person would be tense and wide-eyed if they are engaged by a police officer at 4:00 a.m. Sergeant Kiely explained that people react differently to narcotics, but gave crack, cocaine, powder cocaine, LSD and prescription drugs, as examples of narcotics that could be indicated by a wide-eyed, excited

expression.

Sergeant Kiely explained that he initially did a quick pat-down of the Defendant, but when the Defendant said that Sergeant Kiely had said he had a gun, Sergeant Kiely said he patted him down again in case he had a small weapon, like a twenty-five. Sergeant Kiely agreed that he did not have to have a gun pulled on him. Sergeant Kiely testified that he patted down the Defendant for the presence of a gun not any other contraband, and he confirmed that he did not find a gun, knife, any drugs, or prescriptions on the Defendant. Sergeant Kiely commented that drug users do not normally have drugs on their person because they use them and added that drug dealers may have drugs on them.

Sergeant Kiely said that he did not find any drugs, but he testified that the officer who searched the vehicle found what the officers believed was cocaine on cellophane. Sergeant Kiely said he could not recall if the substance was tested, but he noted that Officer Mullane may know. Sergeant Kiely explained that it is not standard procedure to have substances that are suspected to be drugs sent off, because analyzing residue would cost too much and would clog up the system. Sergeant Kiely said that, to the best of his knowledge, the cellophane was a cigarette wrapper, but again, he noted that Officer Mullane may know. Sergeant Kiely did not recall whether he actually saw the cellophane or not and that he could not testify as to its appearance.

Sergeant Kiely testified that the police cruiser that pulled up while he was outside with the Defendant was either Officer Mullane or Officer Stryker. Sergeant Kiely said he did not know which Officer it was, but he noted that the video would show who arrived. Sergeant Kiely agreed that an officer got into Sergeant Kiely's cruiser and moved it around in front of the Defendant's car. Sergeant Kiely denied that this was done to box the Defendant's car in. He, instead, explained that

the Defendant's car was in the lane of travel and the car was moved to prevent someone hitting the car. Sergeant Kiely agreed that the car was boxed in, but he maintained that it was not boxed in for the purpose of detaining the vehicle. Sergeant Kiely confirmed that the Defendant's automobile was locked, secured, and could not be accessed without the keys. Sergeant Kiely confirmed that the car was on a quiet residential, neighborhood street, but he again noted that it was in the lane of travel. He agreed that it was at the crest of a gentle hill.

Sergeant Kiely confirmed that the Defendant was handcuffed and was not free to go anywhere. He agreed that the car was locked. Sergeant Kiely testified that at some point in the video recording another officer approached the Defendant's car with a flashlight and looked in the car. Sergeant Kiely said he saw Officer Stryker point a flashlight in the car, but he was not sure which officer had looked into the car at which time. Sergeant Kiely agreed that, at some point, Officer Styker came over and talked to Sergeant Kiely. Sergeant Kiely said he did not know if Officer Stryker had gone to the house. Sergeant Kiely testified that he could not recall what the officer said to him after looking in the car.

Sergeant Kiely testified that when the Defendant got out of the car, he believed, the Defendant stepped out and mechanically locked it, but Sergeant Kiely noted that he was not positive about this. Sergeant Kiely said, to the best of his knowledge, the Defendant locked the car with the button and shut the door. Sergeant Kiely did not recall the Defendant standing and locking the automobile with his keys. Sergeant Kiely agreed that the keys were in the Defendant's pocket at that point.

Sergeant Kiely agreed that in the video recording he can be heard saying several times, "I'm asking you a question; I'm asking you a question; I'm asking you a question." Sergeant Kiely could

not recall what he was asking the Defendant.  Sergeant Kiely said he asked the Defendant where he lived and if the complainant was his girlfriend or if they were married.   Sergeant Kiely noted that the Defendant was whispering, and Sergeant Kiely said he suspected that the Defendant was doing so to avoid his voice being picked up on the microphone.  Sergeant Kiely agreed that there may be other reasons for whispering, such as intoxication, but he rebuffed the suggestion that the Defendant would do so because he was tired.  Instead, Sergeant Kiely again noted that the Defendant was in an excited state.  Sergeant Kiely said that when he patted the Defendant down the Defendant spoke in a raised voice, but he asserted that the belt microphone would not necessarily pick up on the tone.  Sergeant Kiely also stated that the distance from the car and the battery level affect the volume of the recording.

Sergeant Kiely was asked about his earlier mention of security clearances.  He testified that if a person who has a security clearance is involved in any kind of criminal activity they are supposed to go through an investigation.  Sergeant Kiely noted that any involvement should be reported immediately because if a person is involved in any criminal activity they lose their security clearance.  Sergeant Kiely confirmed that a comptroller or other personnel had come out to speak to himself and other officers about security clearances.  He said that this talk took place within the month or month and a half before the incident in this case.  Sergeant Kiely again explained that he deals with security clearances in his work at the air base, and he said he was glad someone had come to discuss it because officers had been unclear about what they were to do if a person had a security clearance.

Sergeant Kiely noted that if a suspect is employed by "a normal employer" he may never call the employer to inform this of any criminal issue.  In contrast, Sergeant Kiely said that if the person was employed by an entity like the comptroller discussed, the call would be made immediately.

Sergeant Kiely cited the importance of national security, and he agreed that he would make such a call even at 4:30 in the morning.

Sergeant Kiely said that the Defendant had said he worked out at the plants at Oak Ridge, in a secured area. Sergeant Kiely could not recall the specific plant, but Sergeant Kiely explained that the Defendant had an escorted badge, which would allow him into secured areas. Sergeant Kiely said that the Defendant worked for a government contractor as a laborer, but he admitted that he did not call the contractor because it was not his job. Sergeant Kiely noted that if someone holds a clearance and they have a criminal history that must be addressed immediately. When asked how he knew the Defendant had a criminal history, Sergeant Kiely explained that the Defendant told him, in response to questions that Sergeant Kiely was asking him. Sergeant Kiely explained that in this case he called the comptroller, a man named Bill, who had spoken to the officers earlier.

Sergeant Kiely testified that he could not recall how long the Defendant sat in his cruiser handcuffed. Sergeant Kiely said he sat there long enough for the officers to get far enough into the investigation to find out if the Defendant needed to be let go or brought in on charges. Sergeant Kiely said he could not tell whether he was the person who can be heard saying "the white car up there" at approximately 4:42 a.m. on the recording, without viewing the recording. Sergeant Kiely admitted that he probably told one of the other officers to go up and look at the Defendant's car after the K-9 search. Sergeant Kiely said he did not know what time the K-9 search took place. Sergeant Kiely explained that he could not remember the exact times of events on the video recording, but noted that, after the K-9 alerted, the officer searched the Defendant's car. Sergeant Kiely did not recall someone saying to go look at the car prior to the K-9 sweep, and he agreed that if that question had been spoken, he did not know who said it.

Sergeant Kiely confirmed that Officer Mullane was specifically asked to take the K-9 up to the Defendant's automobile because the Defendant appeared excited, with muscles tense, wide eyes, at 4:00 a.m., and this lead Sergeant Kiely to believe the Defendant may be on narcotics. When asked whether it was possible that the Defendant was scared, Sergeant Kiely commented that he thought the Defendant was intoxicated for the reasons he stated.

Sergeant Kiely agreed that a K-9 was brought to the scene, and he confirmed that when the K-9 searched the Defendant's automobile, the Defendant was handcuffed in the back of the cruiser. Sergeant Kiely confirmed that he had information that the Defendant was trying to break into a house with several people inside on his way to the call. Sergeant Kiely denied that he got a "free shot" at the drug dog sniffing the car and again cited the Defendant's aggravated state. Sergeant Kiely testified that at the point the dog was taken up to the Defendant's car, the officers did not know anything about the cellophane with suspected residue on it. Sergeant Kiely agreed that the officers could not see anything in the car. Sergeant Kiely testified that no one– specifically, the officer who looked through the car's windows– said that they saw cellophane or other drugs in the car.

When asked whether he had just a "hunch" that there were drugs in the Defendant's car, Sergeant Kiely again noted that the Defendant had wide eyes, tense muscles, and was excited, which lead him to believe the Defendant was intoxicated. Sergeant Kiely said that he believed these characteristics were the basis for a reasonable suspicion that there were drugs in the car and that is why the officers had the K-9 go around the vehicle to sniff for the odor of narcotics. When asked about his suspicion again, Sergeant Kiely stated that the characteristics he described were typical of a person using narcotics and are "flags." Sergeant Kiely said that the Defendant did not appear scared or timid to him. Sergeant Kiely noted that the Defendant surprised him by the Defendant

driving up to him before he was ready.

Sergeant Kiely testified that he had seen this particular K-9 sniff cars many times before this night. Sergeant Kiely said he was sure that he had observed the dog more than twenty times. Sergeant Kiely stated that, to his recollection, this dog had been with the police force for several years. He did not recall the first time he saw the dog alert, but he confirmed that the dog always alerts in the same manner, by sitting. Sergeant Kiely testified that police dogs are trained differently. Specifically, there are dogs who have active alerts and passive alerts. Sergeant Kiely said that the KPD's dogs are trained in passive alerts.

Sergeant Kiely explained that whether a dog starts its search at the front of an automobile or the back varies depending on the handler and situation. Sergeant Kiely said there was no standard procedure regarding where the sniff starts. Sergeant Kiely explained that the dog did not continue the rest of the way around the Defendant's car because he alerted on the car. Sergeant Kiely said it was not important if there were other locations on which the K-9 might alert. Sergeant Kiely agreed that after the dog alerted, he had probable cause to search the vehicle for drugs.

Sergeant Kiely said that the officers did not obtain a search warrant. He testified that he was aware judicial commissioners are aware twenty-four hours a day to review warrants, but he did not think it was necessary.

Sergeant Kiely testified that Officer Mullane had come back from the house and told him that light bulbs had been removed and a bedroom window was partially open. Sergeant Kiely said that Officer Mullane did not tell him whether he got this information from someone in the house or from his own observation. Sergeant Kiely confirmed that after Officer Mullane came back he asked the Defendant about getting into his car. Sergeant Kiely reiterated that the Defendant would not give

him the keys until he fixed the Defendant's handcuffs.

Sergeant Kiely testified that he did not ask the Defendant for his keys until after the K-9 had alerted on the automobile for the odor of narcotics. Sergeant Kiely said he explained that the dog had alerted and he needed the keys; the Defendant responded he would not give them until his handcuffs were fixed. Sergeant Kiely said he agreed, the Defendant stepped out of the cruiser, Sergeant Kiely fixed the handcuffs, and the Defendant gave him the keys. Sergeant Kiely agreed that the Defendant did not give him the keys initially, because he first asked that his handcuffs be fixed. Sergeant Kiely agreed that he told the Defendant to turn the f— around" because the Defendant would not cooperate with him getting the keys.

Sergeant Kiely said he did not recall whether the Defendant asked that the officers go get a search warrant during the search of the automobile, but Sergeant Kiely confirmed that no search warrant was obtained. Sergeant Kiely said that he did not get a search warrant because the dog alerted on the vehicle for the odor of narcotics.

Sergeant Kiely agreed that the Defendant's car was locked and that there was no chance of the Defendant getting back in the car while he was detained. Sergeant Kiely testified that he did not let the Defendant go, and he agreed that there was no danger of someone coming to and removing evidence from the Defendant's car while the officers were there.

Sergeant Kiely agreed that any officer safety concerns that morning did not involve the Defendant's car or what was in it.

Sergeant Kiely again confirmed that Officer Mullane was the officer who took the dog to the Defendant's car to conduct the drug sniff, and that the drug sniff took place after Officer Mullane had returned from the house that where the attempted breaking and entering had allegedly taken

place.

Sergeant Kiely testified that the Defendant was charged with breaking and entering and, to his knowledge, it was still pending in state court.

## B.    Officer Brian Mullane

Officer Brian Mullane testified that he is a K-9 handler for the KPD and has been for almost two years.  Officer Mullane testified that, prior to becoming a K-9 handler for the KPD, he was on the Air Force Security Force, which he described as being an Air Force police officer.  Officer Mullane identified his K-9 partner, i.e. his K-9 dog, as "Rocco," who he has been working with for almost two years.

Officer Mullane confirmed that he responded to an in-progress, home break-in on November 28, 2009, and Rocco was with him.  Officer Mullane explained that when he arrived Sergeant Kiely was already on the scene talking to the Defendant.  Officer Mullane said he stopped on the road before he got to the house, to check on Sergeant Kiely.  Officer Mullane recalled talking for a couple minutes and then going down to the house to check with the complainant.

Officer Mullane said that when he got to the house he was told the complainant was a female who was in the house with her new boyfriend.  Officer Mullane was told the Defendant, whom the witnesses called by name, had been trying to break in the house.  He had been banging on the front and rear door.  Officer Mullane explained that the Defendant had removed the lightbulb from the light on the front porch and thrown it across the yard, and attempted to enter the bedroom window.  Officer Mullane said he went to look at the window and had observed a quarter-inch opening where someone had tried to show if open.  Officer Mullane said he saw the lightbulb laying in the grass.

Officer Mullane said he interviewed both of the adult victims, and they were scared. Officer Mullane stated that the male complainant did not know the Defendant and was not familiar with the situation. Officer Mullane said he was very frightened. Officer Mullane said the female was afraid for their safety, and she told Officer Mullane that the Defendant did not have any personal property left at that residence. The complainants described yelling and load banging when the Defendant was trying to enter.

Officer Mullane testified that after he got the complainants' information he went back up to where Sergeant Kiely was on the street and reported back what he had learned. Officer Mullane said he could not remember whether he discussed orders of protection with the complainants, but he noted that normally he will give out a domestic violence pamphlet. Officer Mullane could not recall whether he asked the complainants if the Defendant had a gun.

Officer Mullane testified that he always works with Rocco and that Rocco is trained in narcotics detection. Officer Mullane explained that the department works through the International Police Working Dog Association. Officer Mullane noted that the dogs used to be certified every other year, but now they are certified every year. Officer Mullane testified that he certified in early 2010 and would be doing so again in early 2011. Officer Mullane confirmed that he always works with Rocco and that they train together every month.

Officer Mullane explained that Rocco and the department's other dogs are trained in a passive alert, which is indicated by sitting down or other indicators like a head kick. Officer Mullane noted that the dogs' posture also change when they find an odor. Officer Mullane testified that Rocco will run his tongue over his nose to trap the odor and double-check himself before sitting. Officer Mullane testified that in his experience Rocco has been reliable.

Officer Mullane says that typically, but not always, when he and Rocco are called to a scene someone suspects narcotics. Officer Mullane said the majority of times they come out, they find narcotics, though he also noted that there are "plenty of times" when they do not find narcotics.

Officer Mullane explained that on November 28, 2009, Sergeant Kiely asked him to run Rocco around the vehicle to do an exterior drug sniff, and he did so. Rocco passed the driver's door seam, and he alerted at the door seam, which Officer Mullane said indicated a narcotics odor was present. Officer Mullane confirmed that Rocco was given his Kong, a black rubber ball, following the alert.

Officer Mullane testified that they train to avoid the dog alerting simply to receive the toy. Officer Mullane said that on the street the officers cannot necessarily verify the presence of narcotics, but in training, the officers can control whether the narcotics are present or not. Officer Mullane explained that each month Rocco is run around vehicles with no narcotics. Officer Mullane confirmed that the training ensures that Rocco is not going straight for the toy.

Officer Mullane confirmed that he actually searched the vehicle on November 28, 2009. Officer Mullane stated that he found a handgun on the backseat with a nylon back that had six rounds of ammunition in it. Officer Mullane recalled finding another round in the glove box, with a different caliber and finding a plastic cigarette wrapper with white powder residue on it. Officer Mullane described the white powder residue as being all around the inside of the wrapper. Officer Mullane said the residue was not enough to test, but he noted that it is very common for people to keep their narcotics in a plastic wrapper like that one. Officer Mullane said the residue lead him to believe that there had been narcotics in that cigarette wrapper.

On cross-examination, Officer Mullane testified that he did not recall the Defendant being charged with any drug-related crime. Officer Mullane stated that he did not find an amount of narcotics, just residue, and he confirmed that he did not know whether is an illegal substance. Officer Mullane testified that Sergeant Kiely had the Defendant in custody, the stop was his, and he would make any decisions regarding criminal charges. Officer Mullane confirmed that Sergeant Kiely made the decision to charge the Defendant with only breaking and entering.

Officer Mullane testified that a handgun was found in the center of the Defendant's backseat. Officer Mullane said the handgun was in a small nylon carry case or bag. Officer Mullane confirmed that the gun itself was not visible to someone looking into the car; it was in a bag that was zipped. Officer Mullane said he could not remember whether the bag was covered with anything else. Officer Mullane did not remember to whom the gun was registered, and he stated that he did not run the tag number on the car.

Officer Mullane said he thought he got to the call within minutes, but he could not recall his exact time of arrival. He noted that the video recording would show the time of his arrival.

Officer Mullane testified that Rocco was not allowed to sniff the wrapper with the residue, because once he alerts on the exterior of an automobile he is put back in the cruiser. Officer Mullane testified that typically a dog is not allowed to sniff inside a car because the odor in the car can be moved around and is hard to pinpoint.

Officer Mullane explained that he would have to view Rocco's records to determine how many false positives he has given. Officer Mullane stated that the only time false positives are documented is in training records. Officer Mullane noted that Rocco has over three-hundred entries in his training records and estimated his accuracy at ninety percent.

Officer Mullane agreed that what Rocco is smelling is the odor associated with narcotics and illegal drugs. Officer Mullane stated that Rocco cannot detect ammunition or guns, though there are other dogs that are trained to do so. Officer Mullane confirmed that Rocco is hitting on an aroma. Officer Mullane said he did not know how long an aroma will remain sufficient for Rocco to hit on it. Officer Mullane explained that there are so many variables: what the substance is, how long it was in the vehicle, or whether there was heat, whether windows were open. Officer Mullane agreed that when Rocco alerts it indicates that narcotics are in the car or that they have been in the car in the recent past. When asked how recently drugs would have been present, Officer Mullane again noted the many variables that would affect such a calculation. Officer Mullane agreed that it could have been a couple days since the drugs were actually present in the vehicle. Officer Mullane added that based upon the dog's reaction, he had probable cause to believe that there are narcotics in the vehicle, though he agreed that he did not know when they had actually been in the car.

Officer Mullane testified that he had walked past the Defendant's car prior to bringing Rocco by it, when he first arrived on the scene and approached Sergeant Kiely. Officer Mullane said he believed he had driven his cruiser up and parked it in front of the Defendant's car. Officer Mullane confirmed that he kept Rocco in the backseat of the cruiser while he got out. Officer Mullane said that he got Rocco out of the cruiser after he returned from speaking to the complainant at the home, when he was asked to do so by Sergeant Kiely. Officer Mullane testified that Sergeant Kiely had not told him whether he suspected drugs were in the car or not.

Officer Mullane testified that he went down to the house alone, not with Officer Stryker. Officer Mullane recalled Officer Stryker showing up later and possibly coming up to the house. Officer Mullane could not remember whether Officer Stryker spoke with anyone in the house.

Officer Mullane said he may have stepped into the house's doorway. He noted there were a couple of people sitting on a couch, but he said that he did not go very far into the house. Officer Mullane said he did not go around and look at the back door, and he could not remember if Officer Stryker did so either. Officer Mullane testified that the bedroom which the Defendant had allegedly attempted to open was on the front of the house. Officer Mullane noted that the complainants said it was there bedroom, but he did not go look.

Officer Mullane testified that the complainant said the Defendant sounded angry. Officer Mullane said he asked about the Defendant's personal property because he was trying to figure out why the Defendant wanted into the house. Officer Mullane agreed that he deduced that the Defendant and the female complainant had had a relationship and that he had lived in the house in the past. Officer Mullane confirmed that there was another male in the house, who was staying there, but he did not live there. Officer Mullane recalled the female complainant saying that she and the Defendant had a relationship in the past, and she did not say whose decision it was to break off the relationship.

Officer Mullane testified that he had responded to domestic violence calls in the past and they can be fraught. Officer Mullane agreed that it appeared the female complainant had a new boyfriend and the Defendant was not happy about it. Officer Mullane said he could not recall if anyone described the situation at the house as violent, though they had said there was loud banging, yelling, and an attempt to enter the home. Officer Mullane noted that the complainants had responded by calling 911 and not confronting the Defendant.

Officer Mullane confirmed that the complainants had said the Defendant was behaving angrily and was excited. When asked whether the Defendant's anger or excitement would lead to

a wide-eyed expression, Officer Mullane said he could not testify to how the Defendant would manifest his anger, because everyone shows their anger differently. He agreed that being wide-eyed could be an indicator of anger. Officer Mullane said he did not know what the Defendant's state was when he was pulled over, but he agreed that the complainants had not said he calmed down before leaving.

Officer Mullane testified that after he and Officer Stryker finished talking to the complainants they came back up to where Sergeant Kiely was. Officer Mullane explained that he told Sergeant Kiely the situation at the house, that everyone was safe but that it appeared the Defendant had tried to make entry. Officer Mullane stated that Sergeant Kiely had not asked him to run Rocco around the car when he initially arrived on the scene, but instead, he asked after Officer Mullane returned from speaking with the complainants. Officer Mullane said Sergeant Kiely did not talk about the Defendant's demeanor. Officer Mullane explained that when he initially approached the scene Sergeant Kiely had told him that the Defendant might have a gun or weapon, because a message to that effect had come over the radio and the Defendant had said that he did not have a gun, a comment that seemed odd to Sergeant Kiely.

Officer Mullane recalled that the house's window was not open very far, approximately a quarter of an inch. Officer Mullane confirmed that he wrote the incident report, but he did not transport the Defendant. Officer Mullane said he could not remember who transported the Defendant. Officer Mullane could not recall ever reading the Defendant his rights under Miranda. Officer Mullane could not recall whether Officer Stryker advised the Defendant either. Officer Mullane said he had "no idea" whether the Defendant was ever read his rights under Miranda.

Officer Mullane said he saw Sergeant Kiely get the Defendant's keys from him after the dog alerted. Officer Mullane stated that the Defendant was initially reluctant to relinquish his keys. Officer Mullane said he did not recall what exactly Sergeant Kiely said to the Defendant when he was getting his keys, but he did recall the Defendant having to be told a couple of times to give Sergeant Kiely the keys. Officer Mullane said he did not remember whether Sergeant Kiely was angry about the Defendant's reluctance, but he agreed that if someone refuses your request for their keys, an officer will be a little more firm on the second request. Officer Mullane agreed that the conversation regarding the keys involved several responses and questions and that the exchanges could have possibly been verbally forceful.

Officer Mullane said he could not remember whether Sergeant Kiely attempted to reach into the Defendant's pocket to pull out the keys before the Defendant acquiesced. Officer Mullane said he could not remember whether the Defendant acquiesced. He also did not know whether the Defendant was able to reach in his own pocket while handcuffed. Officer Mullane could not recall whether Sergeant Kiely reached in and got the keys.

Officer Mullane confirmed that at some point in the months leading up to November 28, 2009, the officers had a man from Oak Ridge come and speak to their roll call about security at Oak Ridge.

Officer Mullane reiterated that Rocco was certified and that the process of certification involves observation by master trainers, and he and Rocco are put through tests involving drug alerts and tracking. Officer Mullane said he did not know whether the persons conducting the certification review Rocco's records for false positives.

Officer Mullane said he never suggested getting a search warrant for the Defendant's car. He said he did not know whether Sergeant Kiely, Officer Stryker, and he ever discussed a search warrant, but he said he thought they did not. Officer Mullane said he did not ask the Defendant for permission to search the car, and he could not remember anyone else doing so.

### III.    AUDIO AND VIDEO EVIDENCE

The Court was presented with two exhibits containing audio and/or video evidence. Having viewed their contents, the Court finds that the substance of these exhibits can be summarized as follows:

### A.    Exhibit 1: Radio Traffic Voice CD, November 28, 2009

Between approximately 4:19:20 and 4:22:40 a.m., the following information was radioed out by the dispatcher: a 67 was in progress at 4924 Fleetwood Drive; the suspect had attempted to enter through both the front and back doors; the suspect's name was Deon Patton; the complainants were unsure if he was alone or with someone else; another unit had already been to that address tonight; as units were in route, the complainants stated that there was beating on the door; there were two people in the house on separate phones; the suspect was attempting to come through the window; and at the conclusion of the radio traffic, the operator had lost contact with the complainants.

### B.    Exhibit 2: Video Recording from Sgt. Kiely's Cruiser, November 28, 2009

As the call beings, a radio dispatcher identifies the suspect as Deon Patton, a black male. Ex. 2 at 4:24:03. Sergeant Kiely parks his cruiser, Ex. 2 at 4:24:11, and lights approach, Ex. 2 at 4:24:31. Sergeant Kiely approaches the Defendant's vehicle and asks "Hey buddy, what's your name?" Ex. 2 at 4:24:40. Sergeant Kiely asks the Defendant to turn off his car, approximately three

times. Ex. 2 at 4:24:44-50. Sergeant Kiely asks the Defendant what is going on, and the Defendant responds that he was just going to get his stuff. Ex. 2 at 4:25:19.

The Defendant says, in substance, "She said I had a gun," to which Sergeant Kiely responds, "A gun?" The Defendant retorts, "You just said I had a gun," and Sergeant Kiely asks, "I did." The Defendant explains, "On the radio it did." Ex. 2 at 4:25:37.

Thereafter, a second cruiser arrives, Ex. 2 at 4:26:07, and Sergeant Kiely moves his cruiser behind the Defendant's car, Ex. 2 at 4:27:00. Sergeant Kiely asks the Defendant for identification, while the second cruiser relocates. Ex. 2 at 4:27:15-55. An unidentified officer looks in the Defendant's car with a flashlight. Ex. 2 at 4:28:15.

Sergeant Kiely and the Defendant converse about the Defendant's handcuffs, Ex. 2 at 4:28:25-45, and then Sergeant Kiely asks him if he is dating the female at the house, Ex. 2 at 4:29:07. Sergeant Kiely asks the Defendant for his social security number, Ex. 2 at 4:29:19, and shortly thereafter, a cruiser drives by Sergeant Kiely's cruiser. Again, Sergeant Kiely asks if the Defendant is dating the female at the house, and the Defendant responds they are fighting, which Sergeant Kiely says is not good. Ex. 2 at 4:29:40.

Sergeant Kiely conveys numbers to dispatch, which are likely license plate numbers or license numbers, because shortly thereafter Sergeant Kiely asks the Defendant if he is still living in Morristown. Ex. 2 at 4:30:26 - 31:03. Sergeant Kiely discusses the Defendant's comment about a gun with another officer off camera and then asks the Defendant if he has ever been charged with a felony. Ex. 2 at 4:33:28. Radio dispatch provides Officer Kiely with license and other background information. Ex. 2 at 4:34:00. Thereafter, Sergeant Kiely appears to be asking the Defendant about his prior crimes. The Defendant's comments are inaudible except that he can be heard saying that

he has done his time, and Sergeant Kiely retorts, "I'm just asking you a question." Ex. 2 at 4:36:20 -36:55.

Sergeant Kiely asks if the Defendant has a security clearance and concludes that the Defendant has an escorted contractor status. Ex. 2 at 4:37:07 - 37:34. Sergeant Kiely asks the Defendant where he stays, if he is married, and what kind of work he does. Ex. 2 at 4:38:45 - 40:07. Throughout the exchange, Sergeant Kiely makes remarks to the effect of, "Let's get this figured out, and maybe you'll be on your way." E.g., Ex. 2 at 4:40:49.

Sergeant Kiely asks if the Defendant was over at the house earlier and whether he went into the house. Ex. 2 at 4:41:12 and 41:25. Officer Mullane returns and speaks with Sergeant Kiely, who can be heard saying, in substance, "Bring your partner up here." Ex. 2 at 4:42:15. The sound to Sergeant Kiely's body microphone goes off. Ex. 2 at 4:46:35. The K-9 dog is brought to the car, Ex. 2 at 4:45:05, and he reacts to the driver's door, Ex. 2 at 4:45:15. The microphone sound returns. Ex. 2 at 4:46:35.

Sergeant Kiely asks the Defendant for his keys, to which the Defendant responds that his handcuffs are too tight; this exchange continues for a few seconds. Ex. 2 at 4:46:50 - 47:31. Sergeant Kiely asks the Defendant twice to have a seat. Ex. 2 at 4:48:16-22. The Defendant responds, in substance, "I do, I'm going to be honest with you, I do have a gun in the car." Ex. 2 at 4:48:30. Sergeant Kiely asks if it is loaded, and the Defendant says it is not. Ex. 2 at 4:48:38. The Defendant adds that it is for protection because "he just got cut and bought the gun." Ex. 2 at 4:48:40- 48:44. The Defendant says it is the only thing in the car. Ex. 2 at 4:48:45. Sergeant Kiely asks if the officers need to worry about it going off and the Defendant says no. Ex. 2 at 4:48:47 - 48:53. Sergeant Kiely asks if the Defendant bought it somewhere or is it someone else's gun, but

the Defendant's response is inaudible.  Ex. 2 at 4:49:00 - 49:07.

The officers open the Defendant's car.  Ex. 2 at 4:49:31.  Shortly thereafter, they discover the gun, and Sergeant Kiely can be heard instructing another officer to leave it for the Crime Lab, Ex. 2 at 4:51:17.  Sergeant Kiely notes to the other officers that the Defendant is a convicted felon. Ex. 2 at 4:51:44.


## IV.  FINDINGS OF FACT

The evidence presented at the hearing consisted of: the police radio recording received into evidence as Exhibit 1, the video recording from Sergeant Kiely's cruiser received into evidence as Exhibit 2, the testimony of Sergeant Kiely, and the testimony of Officer Mullane.  The Defendant presented no evidence to dispute the recordings or the officers' testimony.  Accordingly, the Court finds that the recordings and testimony cited above present a reliable summary of the events surrounding the Defendant's arrest.  The Court's specific findings of fact will be included in the Court's analysis.


## V.  ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures.  U.S. Const. amend IV.  The Defendant contends, first, that all physical evidence obtained in the search of his car should be suppressed because it is the fruit of an illegal search.  Second, the Defendant moves to suppress any and all statements he made to the officers, because he contends that the statements are the product of an unlawful custodial interrogation that was conducted without his being advised of his rights under Miranda.  The Court will consider each of these contentions in turn.

**A.     The Search**

The Fourth Amendment protects citizens against unreasonable searches or seizures.  U.S. Const. amend IV.  The basic rule for determining whether a search is reasonable is that "'searches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions.'"  Arizona v. Gant, 556 U.S. __, 129 S. Ct. 1710, 1716 (2009) (quoting Katz v. United States, 389 U.S. 347 (1967)).

*1.     Exceptions to the Warrant Requirement*

One of these exceptions is that of the search incident to arrest.  Police may search a vehicle incident to a recent occupant's arrest only if: (1) "the arrestee is within reaching distance of the passenger compartment at the time of the search," or (2) "it is reasonable to believe the vehicle contains evidence of the offense of arrest."  Gant, 129 S.Ct. at 1723.  "When these justifications are absent, a search of an arrestee's vehicle [is] unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies."  Id. at 1724.

A separate and distinct exception to the warrant requirement is the Terry stop exception, which is an exception made for brief investigatory stops.  Under Terry, "where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances."  United States v. Bentley, 29 F.3d 1073, 1075 (6th Cir.1994).

The Defendant argues that the search at issue in this case is a search incident to arrest.  The Defendant contends that the search does not fall within either of the scenarios in which a search incident to arrest is allowed, and therefore, it is improper.  The Government, in contrast, maintains

that the search was not a search conducted incident to arrest. Instead, the Government argues that Sergeant Kiely conducted a <u>Terry</u> stop, and a K-9 dog search was properly conducted during the <u>Terry</u> stop. The Government maintains that the K-9's alert gave probable cause for a warrantless search of the vehicle.

2.    *The Stop was Proper Under <u>Terry</u>*

The Court finds that the search in this case was not merely a search incident to arrest. The Defendant was properly stopped for investigation. He was detained, or alternatively arrested. Under either of these scenarios, the K-9 dog was run around the car to sniff for the odor of narcotics in a timely manner. The dog's alert provided probable cause to search the vehicle and its contents, which revealed the handgun that the Defendant now seeks to suppress. As more fully explained below, the Court finds the search was legal.

Where an officer has a reasonable suspicion to believe that criminal activity is afoot, he or she may conduct a brief stop of persons or vehicles short of traditional arrest to investigate. <u>See Terry v. Ohio</u>, 392 U.S. 1, 30 (1968). This determination of reasonable suspicion is to be made "in light of the totality of the circumstances," <u>United States v. Caruthers</u>, 458 F.3d 459, 465 (6th Cir. 2006), and requires the officers to "have a particularized and objective basis for suspecting the particular person stopped of criminal activity," <u>United States v. Hurst</u>, 228 F.3d 751, 757 (6th Cir. 2000).

The Court of Appeals for the Sixth Circuit recommends a two-part test to determine the legitimacy of an investigatory stop. <u>See</u>, <u>e.g.</u>, <u>United States v. Luqman</u>, 522 F.3d 613, 616-17 (6th Cir. 2008); <u>United States v. Davis</u>, 430 F.3d 345 (6th Cir. 2005). First, a court must determine "whether there was a proper basis for the stop, which is judged by examining whether the law

enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." Davis, 430 F.3d at 354 (quoting United States v. Garza, 10 F.3d 1241, 1245 (6th Cir. 1993)). If the basis for the Terry stop was proper, then the Court must determine "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." Davis, 430 F.3d at 354 (quoting Garza, 10 F.3d at 1245).

Applying this test to the instant case, the Court finds that Sergeant Kiely was aware of specific and articulable facts that gave rise to a reasonable suspicion. Specifically, he was aware that a breaking and entering had been called in at a residence just yards from where he stopped the Defendant. He was aware that the suspect in this breaking and entering had been identified by name as Deon Patton, a black male. The Defendant, a black male, informed Sergeant Kiely that his name was Deon Patton.

Moreover, the temporal proximity of Officer Kiely and the Defendant's run-in supports a reasonable suspicion, because approximately two minutes before Officer Kiely encountered the Defendant he had been told by the radio dispatcher that a complainant at the home said the Defendant was present and attempting to break into the home. The Defendant was headed away from this very house at 4:20 a.m. on an otherwise empty street, just moments after the in-progress call had been made. Thus, based upon the totality of the circumstances, the Court finds that Sergeant Kiely had reasonable suspicion to stop the Defendant for a brief investigatory stop.

Turning to the second consideration in the test for determining the legitimacy of a Terry stop, the Court finds that the degree of intrusion, entailed by the Defendant's being placed in the back of the cruiser for approximately twenty minutes, prior to the dog sniff, was reasonably related in scope

to the situation at hand. In this case, the Defendant was stopped for the reasons stated above. The information supplied to Sergeant Kiely gave him a strong suspicion that the Defendant had attempted to break into an occupied residence, via at least three different entry points, in the early-morning hours.

Sergeant Kiely sent his back-up officer, Officer Mullane, down to the residence to investigate the allegations of criminal activity almost immediately upon Officer Mullane's arrival at the scene, and Officer Mullane reported back within about fifteen minutes. Only three additional minutes elapsed between the return of Officer Mullane and the dog's sniff of the Defendant's vehicle. The Court finds that this stop totaling an investigatory period of twenty-one minutes from Sergeant Kiely's initial interaction with the Defendant to the dog sweep is reasonably related in scope to the situation at hand. See, e.g., United States v. Ellis, 497 F.3d 606 (6th Cir. 2007), (finding a twenty-two minute traffic stop initiated because a vehicle crossed a dividing line was appropriate where the officer to asked the suspects about their identity, their destination, where they had been and why, how they knew one another, and the purpose of their early-morning trip).

Accordingly the Court finds that the stop in this case was lawful and appropriate under Terry v. Ohio, 392 U.S. 1 (1968).

3.     *Sergeant Kiely Had Probable Cause to Support a Warrantless Arrest of the Defendant for Burglary*

Even if the stop in this case exceeded the time parameters of a Terry stop, the Court alternatively finds that at the time that the Defendant was placed in Sergeant Kiely's cruiser, Sergeant Kiely had probable cause to support a warrantless arrest of the Defendant for burglary. "In the absence of probable cause, an arrest constitutes an unreasonable seizure in violation of the Fourth

34

Amendment." United States v. Torres-Ramos, 536 F.3d 542, 554 (6th Cir. 2010); Ingram v. City of Columbus, 185 F.3d 579, 592-93 (6th Cir. 1999).  In order to determine whether an arrest was supported by probable cause, the Court must determine whether, at the time of the arrest, the "facts and circumstances within [the arresting officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent" person to conclude that an individual either had committed or was committing an offense.  Torres-Ramos, 536 F.3d 542 at 554 (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

The Court finds that in this case the facts and circumstances known to Sergeant Kiely — including the complainants' accounts, the complainants' identification of the suspect by name, the matching physical description, the temporal proximity between the emergency call and the Defendant's encounter with Sergeant Kiely, and the lack of other persons in the area at the extremely early hour— were sufficient to warrant a prudent person in concluding that the Defendant had committed an attempted aggravated burglary, i.e. breaking and entering into a residence in violation of Tennessee Code Annotated §39-14-403, a Class C Felony.  Thus, the Court alternatively finds that Sergeant Kiely had probable cause to arrest the Defendant at the time placed in Sergeant Kiely's cruiser.

4.    *The K-9 Dog's Sniff of the Defendant's Car Was Lawful and Supplied Probable Cause to Support a Search of the Car*

Having found that the detention of the Defendant was lawful, the Court also finds that the dog sniff of the Defendant's car was appropriate, as it was conducted by an officer lawfully present.

A drug detection sniff of items located in a public place by a drug-detecting dog is not a "search" within the meaning of the Fourth Amendment.  United States v. Place, 462 U.S. 696, 707

(1983). Nonetheless, "the canine team must lawfully be present at the location where the sniff occurs" United States v. Reed, 141 F.3d 644, 650 (6th Cir. 1998). "A positive reaction by a properly trained narcotics dog can establish probable cause for the presence of controlled substances," United States v. Berry, 90 F.3d 148, 153 (6th Cir. 1996), and once officers have probable cause to believe that a vehicle contains contraband, they may search the entire vehicle and any containers located within it, California v. Acevedo, 500 U.S. 565, 580 (1991).

In the instant case, Sergeant Kiely and Officer Mullane were lawfully present on a public street conducting a criminal investigation. All of the evidence in the record indicates that Rocco, a properly trained narcotics dog, "hit" on the driver's door of the Defendant's car. This "hit" established probable cause to believe there were controlled substances in the Defendant's car, and provided the officers with probable cause to search the entire vehicle and all containers, including the nylon bag in which the handgun was found.

Thus, the Court finds that the officers had probable cause to search the Defendant's vehicle based upon the K-9 dog's alert on the Defendant's vehicle.

5.      *The Defendant's Request to Suppress Physical Evidence is Not Well-Taken*

Based upon the foregoing, the Court finds that the stop and detention of the Defendant were lawful, the dog sniff was lawful, and the officers lawfully searched the Defendant's vehicle based upon the probable cause supplied by the dog's alert on the vehicle. Accordingly, the Court finds no grounds for suppressing the physical evidence found in the search of the vehicle. The Court finds that the Defendant's request for suppression of physical evidence is not well-taken, and the Court **RECOMMENDS** that it be **DENIED**.

**B.      The Defendant's Statements**

The Fifth Amendment of the United States Constitution protects citizens against being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To facilitate this protection, Miranda v. Arizona, 384 U.S. 436 (1966), requires law-enforcement officers to give warnings, including the right to remain silent, before interrogating individuals, who are "in custody." Stansbury v. California, 511 U.S. 318, 322 (1994).

In this case, the undisputed evidence indicates that the Defendant was not informed of his Miranda rights at any time during his encounter with the officers. The Court finds that he was not so advised, and thus, there are only two relevant inquiries before the Court: (1) whether the Defendant was in custody, and (2) whether the Defendant was interrogated. The Court will address each of these in turn.

*1.      The Defendant Was in Custody*

"In drawing the line between a non-custodial encounter between a citizen and the police (where Miranda does not apply) and a custodial encounter (where it does), courts consider 'all of the circumstances' surrounding the encounter, with 'the ultimate inquiry' turning on whether 'a formal arrest' occurred or whether there was a 'restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Panak, 552 F.3d 462, 465 (6th Cir. 2009) (quoting Stansbury, 511 U.S. at 322).

In this case, the Government has conceded that, while the Defendant was in Sergeant Kiely's cruiser, he was in custody. [Doc. 27 at 107]. Thus, the Government concedes the custodial status of any statements made to the officers, once the Defendant was in the back of Sergeant Kiely's cruiser. Further, the Court finds that based upon the totality of the circumstances, the Defendant was

in custody after he was handcuffed and placed in side Sergeant Kiely's cruiser.

2.    *The Defendant Was Not Interrogated*

Even where the Court finds that the Defendant was in custody, the duty to warn under Miranda arises only where the defendant is subjected to "express questioning or its functional equivalent." United States v. Murphy, 107 F.3d 1199, 1204 (6th Cir. 1997) (quoting Rhode Island v. Innis, 446 U.S. 291, 300 (1980)). Thus, "where a defendant makes a voluntary statement without being questioned or pressured by an interrogator, the statements are admissible despite the absence of Miranda warnings." Murphy, 107 F.3d at 1204 (citing United States v. Montano, 613 F.2d 147, 149 (6th Cir. 1980)).

Despite the Court's request that the Defendant specify the statements which he seeks to have suppressed from evidence, the Defendant maintains that the Court should suppress "any and all statement[s] of the Defendant." [Doc. 30 at 5].

The Court of Appeals for the Sixth Circuit has previously held that "questions that are part of a routine procedure to secure biographical data to complete the booking process" are not interrogation. United States v. Avery, 717 F.2d 1020, 1024 (6th Cir. 1983).

In Pennsylvania v. Muniz, 496 U.S. 582 (1990), the Supreme Court similarly concluded that answers to questions regarding a defendant's name, address, height, weight, eye color, date of birth, and current age were admissible. Id. at 600. The Supreme Court, though, found that such questions constituted interrogation that was exempted from Miranda's requirements as routine booking and pretrial information. Id. Nonetheless, the Court in Muniz did conclude that a question to a suspected intoxicated driver about the date of his sixth birth day was interrogation for purposes of Miranda, because it incorporated the trilemma of truth, falsity, or silence, posed to a suspect when he or she

38

is asked to "communicate an express or implied assertion of fact or belief." Id. at 597.

It is important to note that the Defendant was the subject of a Terry stop either up until the time the K-9 dog alerted on his car or up until the time he was placed in Sergeant Kiely's cruiser. Under either of these scenarios, the Defendant is not entitled to Miranda's protections during the Terry stop, despite the fact that questions may have been asked of him. As the Court of Appeals for the Sixth Circuit has explained:

> "[During a Terry stop, the] officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the encounter provides the officer with probable cause to arrest him, he must then be released." The very nature of a Terry stop means that a detainee is not free to leave during the investigation, yet is not entitled to Miranda rights.

United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003) (quoting United States v. Richardson, 949 F.2d 851, 856 (6th Cir. 1991)).

With this case law in mind, the Court turns to the facts of the instant case. First, the Court finds that any and all questions posed to the Defendant prior to his being placed in Sergeant Kiely's cruiser are investigatory questions made in the furtherance of a Terry stop. These inquiries were not subject to Miranda warnings, and there are no grounds for excluding the Defendant's responses to any of these questions under Miranda.

Second, Sergeant Kiely's questions to the Defendant asking for his identification, social security number, and residence undoubtedly fall within the booking exception. The Defendant's responses to these questions are admissible.

Sergeant Kiely's questions regarding the Defendant's relationship with the complainant, his criminal history, and occupation that were asked after the Defendant was placed in the cruiser present a more difficult query. This inquiry is also somewhat complicated by the fact that many of the Defendant's responses, if they were made, are inaudible.

Nonetheless, having considered the options available to the Defendant, the Court finds that the Defendant was ultimately faced with the trilemma described by the Supreme Court in that he could either tell the truth, lie, or remain silent in response to these questions, and his choice in this regard could likely affect the criminal investigation. Accordingly, to the extent the Defendant responded to any of these inquires and any of these responses were to be used against him in this case, the Court finds that these statements should be suppressed as evidence obtained through custodial interrogation undertaken without the benefit of Miranda warnings.

Next, the Court turns to the statement that is undoubtedly the focus of both parties' advocacy on this issue: the gun-in-the-car statement. As the Supreme Court in Miranda v. Arizona, 384 U.S. 436 (1966), explained, "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today," Id. at 478. Having reviewed the video from Sergeant Kiely's cruiser, the Court concludes that the Defendant's statement was volunteered. The Defendant's statement comes a full minute or so after his conversation with the officers regarding his handcuffs, and it is not made in response to any statements by the officers.

From the recording, it appears that the statement is made simply in reaction to the Defendant's realization that the officers are going to open his automobile within a matter of seconds. The situation presented is similar to that recently addressed by the Court of Appeals for the Sixth

Circuit in <u>United States v. Smith</u>, 285 Fed. App'x 209 (6th Cir. 2008), where the defendant responded to officers finding a gun in her residence by saying that she had been robbed and the gun was for protection. The Court of Appeals concluded that "the conditions under which [the defendant] allegedly made her statement were far from those 'the police should know are reasonably likely to elicit an incriminating response,' but instead were simply those 'normally attendant to arrest and custody.'" <u>Id.</u> at 214 (citing <u>Innis</u>, 446 U.S. at 300).

The Court similarly concludes that the circumstances surrounding the gun-in-the-car statement, were not those described in <u>Innis</u> or those to be protected against by <u>Miranda</u>. Accordingly, the Court finds that the gun-in-the-car statement should not be suppressed.

Finally, the Court finds that Sergeant Kiely's follow-up question regarding whether the handgun was loaded was an administrative question meant to protect the officers, and the Defendant's response thereto should not be suppressed.

Nonetheless, Sergeant Kiely's final question regarding how the handgun was obtained was likely to produce an incriminating statement, and it fulfilled no booking or administrative concern. Therefore, the Defendant's response thereto, should be suppressed as evidence obtained through custodial interrogation undertaken without the benefit of <u>Miranda</u> warnings.

Thus, in sum, the Court finds that: the Defendant was not advised of his rights under <u>Miranda</u>; he was in custody from, at the earliest, the time he was placed in the back of the cruiser; and the Defendant was, at times, subjected to interrogation. Accordingly, the Court recommends that the Defendant's request to suppress any and all of his statements to the officers, be **GRANTED IN PART** and **DENIED IN PART**, to the extent stated above.

## VI. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing and after reviewing the relevant legal authorities, the Court finds that the Defendant's request for suppression of physical evidence is not well-taken and his request for suppression of his statements is well-taken, in part. Therefore, the Court **RECOMMENDS** that the Defendant's Motion to Suppress [**Doc. 19**] be **GRANTED IN PART** and **DENIED IN PART**, to the extent more fully explained above.[3]

Respectfully Submitted,

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[3]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).